# EXHIBIT A

Case 5:23-cv-00912-FWS-SP    Document 1-1    Filed 05/19/23    Page 2 of 27    Page ID #:10

| | SUM-100 |
|---|---|

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
J. P. MORGAN CHASE BANK, NA, J.P. MORGAN CHASE & Co., and J.P. MORGAN SECURITIES, LLC, and FINANCIAL INDUSTRY REGULATORY AUTHORITY

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
AMY VAN

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

APR 1 2 2023

BY: Mariah Mora    Deputy

</td></tr>
</table>

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 o más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):* SAN BERNARDINO SUPERIOR COURT

San Bernardino Justice Center, 247 West 3rd St., San Bernardino, CA 92415

</td><td>

CASE NUMBER:
*(Número del Caso):*
CIVSB2224828

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Anthony P. X. Bothwell, 558 Presidio Blvd., Ste. B, PO Box 29547, San Francisco, CA 94129-0547, Tel. (415) 370-9571

| DATE:<br>*(Fecha)* APR 1 2 2023 | Clerk, by<br>*(Secretario)* Mariah Mora | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courts.ca.gov |
|---|---|---|

For your protection and privacy, please press the Clear This Form button after you have printed the form.

[ Print this form ]    [ Save this form ]    [ Clear this form ]

1   ANTHONY P. X. BOTHWELL, SBN 200740
    Law Offices of A. P. X. Bothwell
2   558 Presidio Blvd., Ste. B
    Post Office Box 29547
3   San Francisco, CA 94129-0547
4   Tel.: (415) 370-9571
    E-mail: apxb007@msn.com
5
6   Attorney for Plaintiff

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

OCT 28 2022

BY *Marian Moya*
Marian Moya    DEPUTY

7               **SUPERIOR COURT OF CALIFORNIA**
                **COUNTY OF SAN BERNARDINO**
8

9   **AMY VAN,**

10                                          **COMPLAINT**
                                            Cal. Labor Code § 1102.5
11                                          Wrongful Discharge
12          v.                              No. CIV SB 2 2 2 4 8 2 8

13  **J P MORGAN CHASE BANK, N.A.,**
    **J.P. MORGAN CHASE & Co., and**
14  **J.P. MORGAN SECURITIES, LLC,**

15          Defendants
16
17  And
18  **FINANCIAL INDUSTRY REGULATORY**
    **AUTHORITY,**
19
20          Defendant Only as to Injunctive Relief
    _____
21
22                      **I. PARTIES**

23  1.      Amy Van, the Plaintiff, is a citizen of the United States, born in Saigon, of Chinese and

24  Vietnamese ancestry. She resides in Los Angeles County. All acts of retaliation and

25  discrimination against her as alleged herein took place in the State of California. She may be

26  contacted through her counsel, T. M. Guyer and Ayers & Friends, P.C., P.O.B. 1061, Medford,

27  OR 97501.

28

1

Angelica Segura

**RECEIVED**

OCT 2 8 2022

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

2.      Van was employed as a Relationship Banker, Small Business Specialist (SBS), by

respondent J.P. Morgan Securities, a wholly owned subsidiary of respondent J.P. Morgan Chase

& Co. (JPMC). Van was a J.P. Morgan employee from November 25, 2008 until November 1,

2020. The Respondents – JP Morgan Chase Bank, N.A., J.P. Morgan Chase & Co. (JPMC), and

J.P. Morgan Securities, LLC – are referred to in this Complaint as "J.P. Morgan."

3.      Van was an employee within the meaning of Cal. Labor Code § 1102.5 and Cal.

Gov. Code § 12940 because at all times relevant to this Complaint she was working in California

as an employee of J.P. Morgan, which was doing business in California.

4.      J.P. Morgan, at all times relevant to this case, has been led by Chairman and Chief

Executive Officer Jamie Dimon (hereafter Office of the CEO). Following several public scandals

and large financial penalties imposed by the Consumer Financial Protection Bureau and the

Securities and Exchange Commission starting in 2012, the Office of the CEO announced an

"open door policy" allowing any employees to contact the Office of the CEO directly with

disclosures of wrongdoing. Upon receipt of such disclosures, the Office of the CEO assigns them

for investigation to departments and individuals within J.P. Morgan. In the absence of any

effective internal administrative system for reporting fraud, abuse, and misconduct, Van directed

almost all of her protected disclosures and complaints to the Office of the CEO.

5.      The Financial Industry Regulatory Authority (FINRA) regulates the Defendants in

trading in equities, corporate bonds, securities futures, and options. As part of its regulatory

authority over Defendants, FINRA periodically conducts regulatory exams and licenses

individuals and admits firms to the industry, writes rules to govern their behavior, examines them

for regulatory compliance, and is sanctioned by the U.S. Securities and Exchange Commission

(SEC) to discipline registered representatives and member firms that fail to comply with federal

2

To:                                  Page: 07 of 32                    2022-10-28 06:25:35 GMT                   18888664720                   From: Stephani Ayers

1    securities laws and FINRA's rules and regulations. It provides education and qualification

2    examinations to industry professionals. FINRA posted an adverse licensing decision against

3    Plaintiff on a U5 form, and to obtain injunctive relief to have that decision removed, FINRA

4    must be named as a party to this action.

5

6                                **II.   INTRODUCTION**

7    6.       Amy Van, the Plaintiff, through her counsel, alleges and seeks compensatory and

8    punitive damages and equitable relief against J.P. Morgan Chase Bank, N.A., J.P. Morgan Chase

9    & Co., and J.P. Morgan Securities, LLC (J.P. Morgan), the Respondents, for unlawful

10   employment practices under Cal. Labor Code § 1102.5 and wrongful discharge in violation of

11   state and federal public policy.

12
13   7.       In accordance with her education and knowledge of financial requirements and rules and

14   certifications, Plaintiff disclosed that J.P. Morgan was engaged in consumer financial fraud, as

15   well as wire fraud by funds transfers, and by intentionally perpetrating and acquiescing to

16   customers and clients being misled as to their eligibility to open, maintain and use their accounts.

17   She disclosed that J.P. Morgan, for its own financial gain and that of its managers and

18   employees, was actively misrepresenting client status and verification as U.S. persons and non-

19   U.S. persons in order to induce said clients to deposit their funds with J.P. Morgan, and to pay

20
21   for the banking services J.P. Morgan marketed to the clients.

22   8.       Plaintiff objects to any compulsory judicial order requiring her to participate in

23   arbitration with the Financial Industry Regulatory Authority (FINRA) or any other entity because

24   such a court order would constitute state action depriving her of her equal protection and due

25   process rights under Article I section 7 of the California Constitution, and the 14th Amendment

26   of the U.S. Constitution. FINRA and other national arbitration programs are overwhelmingly

27

28

                                            3

homogenously staffed with older while male arbitrators, and Defendants exercising of a waivable right to compel arbitration of this case would constitute an intentional effort to prevent racial minority jurors and judges from adjudicating Plaintiff's claims herein.

9.      Additionally, under FINRA rules, federal claims for violation of statutory whistleblower and discrimination rights are exempted from FINRA arbitration. It would violate California's constitution and public policies to deny that exemption to whistleblowers under Labor Code § 1102.5(a)-(b).

### III.  GENERAL FACTS

10.     As a foreign-born U.S. citizen of Chinese and Vietnamese ancestry, Plaintiff's success at J.P. Morgan was based in part upon the strong connection she developed to J.P. Morgan's large client base of foreign-born customers, many of whom had significant language and cultural barriers to understanding account eligibility standards. She found customers often erroneously assumed that account eligibility was not dependent upon status as a U.S. person. Plaintiff was concerned that the actions by J.P. Morgan employees in disregarding Know Your Customer (KYC) and Customer Identification Program (CIP) requirements could lead to the unjustified interruption, freezing, or seizing of their account funds needed to support their families.

11.     The J.P. Morgan branches in Los Angeles and San Bernardino counties where Complainant worked include some of the highest concentrations of immigrants in the United States, many of whom are neither citizens, permanent residents, visa holders, nor otherwise documented.

12.     J. P. Morgan Chase & Co., including the Office of the CEO, and its Hong Kong affiliate, agreed to pay $264 million in fines to settle allegations that it illegally hired friends and relatives of officials of the government of the PRC in exchange for business, as reported in international

1    news media in November 2016. In August 2018, J.P. Morgan was compelled by federal

2    regulators, Congressional pressure, and risk analysis to commit that J.P. Morgan would end

3    allowing foreign retail clients to open or maintain investment accounts. In 2020, J.P. Morgan and

4    its Office of the CEO feared the possibility that a whistleblower would disclose the fact that such

5    illegal and prohibited practices were still going on in J.P. Morgan. Plaintiff Amy Van acquired

6    personal knowledge of evidence of continuing bribery, money laundering, and other illegal

7    practices in J.P. Morgan – and correctly believed it was her duty to report what she learned. She

8    thought that J.P. Morgan management would take corrective action.

9

10    13.    Complainant received on-the-job training and engaged in self-study to understand federal

11    regulations requiring J.P. Morgan, like every other financial institution, bank, and securities

12    brokerage, to implement and continuously monitor its own written Know Your Customer (KYC)

13    process to prevent customer and employee financial crimes or misconduct.

14    14.    On August 17, 2015, Plaintiff Van was transferred to J.P. Morgan's Chino Hills Branch.

15    In 2018, she became Manager on Duty (MOD). On October 8, 2018, J.P. Morgan transferred

16    Van to Chase Chino Hills Parkway Express Branch office along with her colleague, Chase

17    Private Client Banker Paul Shin (Shin).

18    15.    Van met or exceeded all performance expectations throughout her employment with J.P.

19    Morgan. She received merited accolades. A September 18, 2020 audit of her branch resulted in

20    high scores for Van and Shin. In October 2020 – the same month in which her employment was

21    terminated – Van received surveys from clients stating she was helpful, efficient, and saved

22    costs. She also received a laudatory "WOW" card from her colleagues.

23    16.    J.P. Morgan's written, though too often ignored, KYC process included a CIP and

24    Customer Due Diligence (CDD) procedures. These procedures, if implemented by trained staff,

28

5

1  would prevent (1) money laundering, by detecting behavior that may indicate a customer or

2  employee is disguising illegally obtained money as legitimate, and (2) financial fraud including

3  bribery, embezzlement, identify theft, credit card fraud, and tax evasion.

4

5  17.    Van found that J.P. Morgan's CCD process was seldom the subject of meaningful

6  ongoing training. CCD was rarely used by account managers beyond the Simplified Due

7  Diligence (SDD) level. SDD merely collects customer information without any detailed risk

8  assessment. Nevertheless, Van regularly performed verifications at the Basic Customer Due

9  Diligence (BCDD) level, which involves a more thorough investigation of the customer opening

10  the account. Van had no access to J.P. Morgan's Enhanced Due Diligence (EDD) level if it

11  existed. EDD uses expert analysis and continuous monitoring of high value accounts that have

12

13  shown signs of suspicious activity or risky transactions.

14  18.    KYC was a cause of friction between J.P. Morgan and its customers. Brian Cromer

15  (Cromer), a banker in the Chino Hills branch, warned Van that if she pressed a customer too hard

16  for verification, she might be subjected to verbal abuse. In fact, Van was screamed at by certain

17

18  customers when she had to have their accounts restricted. However, Van knew that non-

19  compliance with KYC could not only injure the interest of customers in uninterrupted access to

20  their funds but could also result in regulatory enforcement actions and fines against J.P. Morgan.

21                           **IV.  PROTECTED ACTIVITY**

22  19.    In early 2017, Plaintiff Amy Van and her colleague Paul Shin submitted a Suspicious

23
    Activity Report (SAR) regarding client E.W., who consistently had wire transfers coming into a
24
    custodian account. Van informed Cromer that Client E.W. might be kiting or layering to avoid
25
26  tax reporting to, and scrutiny by, the Internal Revenue Service (IRS). Client E.W. used the

27

28

account for daily expenses, also transferred her own account at East West Bank to the J.P.

Morgan custodian account, and requested a wire transfer for purchase of a house.

20.    After more than one Suspicious Activity Report (SAR) report had been issued, J.P.

Morgan finally closed client E. W.'s account and her family account on April 25, 2017.

However, Cromer failed to file a legally required SAR report on client E.W.'s transaction and the

KYC and CIP violations.

21.    On October 3, 2017, the back office representative informed Van that an account of

clients J. and B. S. could not be opened because their trust documents needed amendment.

Cromer removed and replaced a page from a client account application in order to obtain

approval and directed another J.P. Morgan employee to open the account. Van objected, to no

avail, to opening the account for clients J. and B. S. Following up later, Van reported this to the

Office of the CEO on October 20, 2020, by which time Van had discerned a significant pattern

of irregularities.

22.    On March 15, 2018, Van discovered a non-U.S. citizen wanted to open a "CJ Trade"

business account with Chase Merchant Services, a J.P. Morgan solution for quick processing of

online customer, merchant, and business transactions, including by mobile phone apps.

Successful enrollment in Chase Merchant Services allows high-amount deposits, but enrollment

is not open to nonresident foreign nationals. To prove his eligibility, the CJ Trade customer

presented a paper copy of a Southern California Edison ("SCE") online electricity bill.

23.    Attempting to validate the paper copy in compliance with document and non-document

KYC and CIP procedures, Plaintiff Van instructed the customer to login to his SCE account for

her review. Van determined the paper copy appeared to have been altered. Van declined to open

7

the requested Chase Merchant Services account and encouraged the client to present KYC and

CIP identify verification.

24.     On March 16, 2018, Van learned the CJ Trade customer opened the account at a different

J.P. Morgan branch using the altered SCE bill. Van notified the J.P. Morgan compliance officials

of this KYC-CIP noncompliant activity being permitted by the other branch. J.P. Morgan

thereafter restricted the account, then closed it and ended the banking relationship with the CJ

Trade client. However, Cromer informed Van of his efforts to get the account unrestricted.

Cromer and other employees criticized Van for having caused the rejection of a potentially

lucrative account. This chorus of criticism reflected a corrupt corporate culture tacitly approved

by J.P. Morgan management.

25.     On August 30, 2018, while anticipating the aforesaid transfer of Van to the Chino Hills

Parkway Express branch to be implemented as scheduled for September 25, 2018, Cromer

requested Van's newly designated manager, Brittany Cruz (Cruz), to participate with Van in

selecting not more than five of Van's best customers whom she would be allowed to service

from the Chino Hills Parkway Express Branch to which Van was newly assigned. The resulting

loss of the balance of Van's customers diminished her career and income opportunities.

26.     As early as October 2018 in the Chino Hills branch, Amy Van and her colleague Paul

Shin had conversations regarding Van's concerns about J.P. Morgan involvement in money

laundering activity. These conversations were heard by Roxanne Monterosa (Monterosa), a

banker in the Chino Hills Branch who – functioning as an agent for management – regularly

listened to the conversations between Van and Shin. In fact, Monterosa spent a significant

amount of her time stalking and monitoring Van as opposed to performing her own job as a

banker. Monterosa regularly reported to Jesse Ortega (Ortega), Bank Manager of the Chino Hills

Parkway Branch, informing Ortega about what she heard Van discuss with Shin. Van knew

Monterosa relayed to management the substance of her conversations with Shin. Management

was aware Van knowingly informed management, through Monterosa, about Van's concerns in

regards to J.P. Morgan involvement in money laundering.

27.     As a consequence of persistent delays in the opening of the new branch, Van had to

relocate temporarily to the Grand and Roswell Branch, for approximately two months. Not until

December 4, 2018, did the Chino Hills Parkway Branch officially open.

28.     In late 2018 or early 2019, Van found it necessary to report client L.C. to the Compliance

Department and Relationship Manager because the client's tax return showed her business was

owned by a company, not by the client, yet the banker who opened the client's account listed her

business as owned 100 percent by L.C. herself. Van's reports caused the customer's account to

be closed.

29.     In late 2019 and continuing into 2020 up to the date of her termination effective

November 1, 2020, Van escalated reporting of material concerns disclosing KYC and CIP

violations, potential fraud, and wire fraud through funds transfers, violations of federal

regulations, and whistleblower retaliation. Van did so with the expectation that her disclosures

would be documented and transmitted internally within J.P. Morgan; externally to regulators

including the Securities Exchange Commission (SEC), Consumer Financial Protection Bureau

(CFPB), Office of Comptroller of the Currency (OCC), Department of Homeland Security,

Financial Crimes Enforcement Network (FinCEN) and Internal Revenue Service; and publicly to

trade and industry publications which regularly report on financial and regulatory issues of

material interest to shareholders and to Congress.

9

30.     In mid- to late 2019, Van reported to Albert Lei (Lei) that Banker Paul Hoang (Hoang) had falsified a customer J.D's occupation and income source for an investment account. The customer was attempting to lock away his funds because his employees were suing him.

31.     In 2019, Van filed an SAR against a client L.L. During a meeting with the client and his father, the father asked if Van or Lei knew of any petroleum companies for sale. The father asked if they knew how to invest his money, given that Van and Lei were "both Chinese." The father claimed $10 million was being wired to the account, but it never arrived. As this raised her suspicion of potential money laundering, Van advised Lei to file an SAR as well.

32.     On October 4, 2019, Van escalated her concerns to Diane Vinh (Vinh), Vice President Investigator, JPMC Regional Investigations, and to Michele Cox, Vice President Human Resources. After meeting with those officials, Plaintiff Amy Van emailed additional relevant information to Vinh regarding Van's actions in preventing J.P. Morgan from opening accounts with altered documents in violation of KYC, CIP and 49 C.F.R. § 1570.5 (prohibiting fraud and intentional falsification of records). This additional relevant information also included her efforts to prevent violations regarding the CJ Trade Merchant Services account and Cromer's condemnation of those efforts.

33.     On October 5, 2019, Van identified an additional KYC-CIP violation and potential money laundering. Client Z.F., who spoke only Mandarin and poor English, requested a cashier's check payable to a third party in the amount of $50,000. Van reviewed Client Z.F.'s account history and wire transactions. Van ascertained that Client Z.F. possessed two passports, one from the PRC and one from the Republic of Vanuatu. According to Article 3 of China's Nationality Act, the PRC does not recognize dual nationality and, under Article 9 of said Act, a Chinese national living abroad who has acquired any other nationality automatically loses the Chinese

To:    .    .    .                                                                                          From: Stephani Ayers
Page: 15 of 32              2022-10-28 06:25:35 GMT          18888664720

nationality and passport. Van ascertained that Chinese nationals intending to thwart banking laws

do so by purchasing Vanuatu citizenship and obtaining that country's passport. Van reported her

concern to Ortega, who ignored her concern and approved the transaction for the teller.

34.    On October 8, 2019, Van emailed Dennis Dumpit (Dumpit) in the Fraud Department

regarding client Z.F.'s apparent false identity, his large wire transactions, and his use of large

cashier's checks made payable to one or more casinos, all in violation of the Bank Secrecy Act of

1970 (BSA). Dumpit expressed concern over Van being the first one to report client Z.F.'s

activities. J.P. Morgan later closed the account on the ostensible grounds of a negative account

balance. Van emailed the Office of the CEO, elevating this issue on October 8, 2019, with

follow-up reports in September 2020, by which time she discerned a disturbing pattern of

deceptive practices and evasion of legal mandates in J.P. Morgan.

35.    On October 8, 2019, Van emailed the Office of the CEO, reporting violations with

regards to client E.W., including J.P. Morgan having designated a non-U.S. citizen as a U.S.

citizen.

36.    On October 11, 2019, Van emailed the Office of the CEO requesting a reinvestigation of

her concerns after Diane Vinh, Vice President - Investigator, stated that several of Van's

concerns had already been investigated, without identifying the CJ Trade outcome. On October

22, 2019, J.P. Morgan attorney Asilia Backus (Backus), Employee Relations Partner and Vice

President, contacted Van on behalf of the Office of the CEO to hear Van's concerns and related

concerns of Paul Shin as well.

37.    On December 11, 2019, Van had a telephone interview with Backus regarding

management hostility against Van for pursuing her regulatory concerns.

11

38.    Starting in early 2020, Van had conversations with Paul Shin regarding J.P. Morgan's practice of giving jobs to friends and relatives of PRC government officials in exchange for business. These conversations were heard by management's agent, Roxanne Monterosa, who reported Van's statements to Bank Manager Jesse Ortega. Management was aware Van knowingly informed Ortega, a J.P. Morgan management official, through Monterosa, about Van's statements related to the J.P. Morgan practice of giving jobs to friends and relatives of PRC government officials in exchange for business.

39.    On February 25, 2020, Van had a group teleconference with Carlos E. Rojas Jr. (Rojas), a J.P. Morgan Private Client Advisor, Dawn W. Verdugo, Supervisory Manager, and Chunyi "Albert" Lei (Lei), a J.P. Morgan Securities Broker, regarding a prohibited nonresident investment account held by client J.H., a national of China living in the Republic of Malawi. Van viewed the non-closure of this unauthorized account to have resulted from the misconduct of Rojas. On or about September 14, 2020, Van reported this violation and the lack of required regulatory enforcement to the Office of the CEO.

40.    On May 5, 2020, Van witnessed Jingwen "Cornie" Ye (Ye), Senior Relationship Banker, requesting to contact client C.Z. on the Chinese messaging app WeChat. J.P. Morgan employees are prohibited from transacting business with clients on any messaging app not managed by J.P. Morgan. Van reported this violation to Securities Broker Lei and the Office of the CEO. Lei responded that Ye had been repeatedly warned for this violation. Van also reported to the Office of the CEO about the potential conflict of interest in which Ye's parents held a J.P. Morgan investment account managed by "Albert" Lei and one by Lei's wife at Bank of America.

41.    On June 25, 2020, Van witnessed Kevin Lu (Lu), Relationship Banker, at the Bank's Grand and Roswell Branch, together with Paul Hoang (Hoang), then Vice President and Private

Client Advisor, presenting an investment proposal to a customer in Mandarin. Van objected that only certified investment translators may transact securities business in a foreign language. In 2020, Van overheard Hoang when he was on the telephone with Lu and a customer who did not speak English.

42.    Van heard Lu, speaking Mandarin, say: "Don't take out your money – we have a better investment proposal that you can consider." Lu translated for Hoang, who could not speak Mandarin. Van, knowing a banker such as Lu is not allowed to translate investment proposals for a financial advisor such as Hoang, confronted Lu, telling him, "We can't do that." Lu replied, "If I don't do that, how can I make money?" Van next confronted Hoang on the phone; he replied: "I'm not here to get Kevin fired." Hoang denied Lu was doing the transaction. Van knew that other bankers, including Hoang and Lu, made customers sign everything in English when a proposal is done in Mandarin by a banker. Van expressed concern because Lu was not a trained translator. She was further concerned because, according to J.P. Morgan policy consistent with relevant laws, a licensed banker is not allowed to present an investment proposal to a customer.

43.    In July or August 2020, Van was assisting customer S.A., who was attempting to open a business account. J.P. Morgan could not open the business account because the customer's personal account was restricted. Van determined that J.P. Morgan needed to verify the customer's federal Paycheck Protection Program (PPP) loan-related business ownership and the customer's name, because his name was very similar to his father's. Van learned the account was unrestricted the next day, and she contacted the banker to explain why the account had to be restricted again. The banker told Van that his manager wanted her to call and stop e-mailing on the matter. The banker and his manager refused to correct the error; the client – having

13

1    committed fraud – withdrew the PPP money. Van reported this to Ortega, who said that Van had

2    done her due diligence and should move on and not let it bother her.

3    44.    On or about August 18, 2020, Shin, Lei, and Van communicated with client T.Y. about a

4    potential investment account. Van ascertained that client T.Y. had non-citizen permanent

5    resident status but that Loan Officer Leo Pui Hong Wai of the J.P. Morgan Alhambra Branch had

6    listed client T.Y. as a U.S. citizen. Client T.Y. was asked fraudulently to sign a W-9 taxpayer

7    identification number certification, which would prevent detection of his non-citizen status. Van

8    reported this KYC-CIP violation to Ortega.

9    45.    On September 19, 2020, Van e-mailed the Office of the CEO to report a lack of

10   regulatory compliance regarding client J.H.'s non-U.S. citizen account not having been closed.

11   On September 21, 2020, Van followed up in an e-mail to the Office of the CEO, referencing the

12   pattern of bank compliance failures. In fact, Van gave management the names of more than a

13   half dozen individuals who had been hired by J.P. Morgan only because of where they were from

14   and who their relatives' friends were. Prior to September 22, 2020, Van disclosed directly to the

15   Office of the CEO that J.P. Morgan was hiring certain people based on their family and

16   friendships rather than on the basis of job qualifications, that it appeared there was money

17   laundering going on in J.P. Morgan, and that Van was mistreated by management after she spoke

18   up about these improper and illegal activities. Responding after at least a week had passed, two

19   management representatives, Kelly Rhodes, Vice President-Americas Employee Relations

20   Partner, and Heather Sliemers of Human Resources (HR), contacted Van, but no corrective steps

21   were taken. Instead, two weeks after Van made her reports to them, Rhodes and Sliemers falsely

22   accused Van of threatening Brian Cromer, who by the time of their accusation, had not been in

23   Van's supervisory chain for almost two years.

46.    On September 23, 2020, Cherie Niswonger, HR Business Partner at J.P. Morgan in Ohio, informed Van that Employee Relations would review the concerns Van reported to the Office of the CEO. On September 29, 2020, Julie Sanchez (Sanchez), Vice President, HR Business Partner for the Firm, and Clarissa Ramos-Cafarelli (Ramos-Cafarelli), HR Managing Director, interviewed Van.  On October 1, 2020, Van recorded the reports she made to Sanchez and Ramos-Cafarelli into "Client Central," a system which tracks calls J.P. Morgan bankers make and a system which is accessible to all J.P. Morgan bankers, managers, Global Security & Investigations (GSI), and HR.  J.P. Morgan failed to take meaningful corrective action regarding Van's complaints to the Office of the CEO and the HR representatives.

47.    On October 3, 2020, client K.D. sought to add her husband to her business account. Van ascertained that a J.P. Morgan banker had falsely classified client K.D. as a U.S. citizen. Van reported this violation to the Office of the CEO and to Sanchez of HR.

48.    On October 20, 2020, Van provided additional evidence, to the Office of the CEO and Rhodes, supporting her reports of noncompliance and violations of law by J.P. Morgan.

### V.    ADVERSE ACTIONS

49.    After Plaintiff Amy Van began making her KYC-CIP protected reports in 2019 and continuing up to the date of her termination effective November 1, 2020, J.P. Morgan subjected her to increasing hostility at work, and withheld clients and commissions from her, instructed her to stop assisting some of her clients, and ordered her to stop focusing on investigation of regulatory violations.

50.    On October 5, 2020, Heather Sliemers, the Threat Security Manager, of the J.P. Morgan Threat Management office, and Employee Relations Vice President Rhodes informed Van that she was under investigation, purportedly for making a threatening comment on September 22,

2020 about "hurting" Brian Cromer. Van did act in the preceding year to have Cromer held

accountable for the regulatory violations she had reported and had shared with colleagues the

disclosures and charge of discrimination she had made against him. However, while this would

"hurt" his career, Van denied the false statement suggesting she threatened to hurt him

physically, and surmised the falsehood was a response to her protected activity. Van submitted a

statement asserting her innocence and concerns that she was being targeted for retaliation.

51.    On approximately October 15, 2020, Albert Lei, the Securities Broker, informed Van that

he and colleagues had heard she was "in trouble."

52.    On October 16, 2020, J.P. Morgan placed Van on involuntary paid administrative leave.

53.    On October 30, 2020, J.P. Morgan terminated Van in a phone call with Employee

Relations Executive Director Shelly Liapes and Regional Director for Consumer Banking

Johnny Montes. The termination was effective November 1, 2020.

54.    These officials did not share with Van the findings of J.P. Morgan's investigation of her,

but merely said the termination was related to allegations that she had made a threatening

comment about Cromer. Van was informed she had no right to have the termination decision

internally reviewed, despite the fact that J.P. Morgan claims to have a progressive discipline

policy with management review.

55.    J.P. Morgan offered Van a release agreement, to pay her $10,000 in consideration for

waiving her rights to file any claims against J.P. Morgan. Van rejected the offer.

56.    Despite J.P. Morgan's purported investigation and with full knowledge that a termination

would result in an adverse U5 (Uniform Termination Notice for Securities Industry Registration)

for threatening workplace violence, J.P. Morgan has never, to the present day, provided Van with

any copy, not even a redacted copy, of the investigative report. On November 12, 2020, J.P.

16

Morgan destroyed Van's career and livelihood by filing the following false statement in the U5

form filed with the Financial Industry Regulatory Authority (FINRA):

> Terminated by Affiliate Bank- Non Securities Related.
> Registered Rep, in the Capacity of an Affiliate Bank
> Employee, for allegedly violating the Affiliate Bank's
> Violence Free Workplace Policy. The Registered Rep
> denies the Allegation.

## VI.  DAMAGES AND INJURIES

57.    Since the date of this U5 filing, Van has been unable to find work in her industry.

58.    The termination of Plaintiff has destroyed her career, professional reputation, and chosen

vocation in the financial services industry.

59.    The termination of Plaintiff caused her to suffer severe emotional and mental distress

including depression.  She has also been diagnosed with chronic stress, loss of self-esteem, and

enjoyment of life, and anxiety caused by the J.P. Morgan's adverse actions against her.

60.    Defendants' actions against Plaintiff were taken wantonly and willfully in disregard of

societal norms of the employer-employee relationship.  The Defendants did so to punish her and

to dissuade other whistleblowers and employees from reporting banking and securities violations

to regulators within and outside the company.  Defendants will continue this anti-social conduct

unless they are ordered to pay punitive and exemplary damages.

61.    There is no business-records exception to punitive damages when the sole purpose of the

U5 statement was consciously to propagate a harmful falsehood.  The statement in the U5 filing

by J.P. Morgan, that Plaintiff violated the Violence Free Workplace Policy, was committed,

authorized, or adopted and approved by one or more officers of J.P. Morgan acting on behalf of

J.P. Morgan.

17

62.     This conduct by J.P. Morgan constituted malice done with intent to cause injury,

despicable, and with willful and knowing disregard of Plaintiff rights. It constituted oppression

and was despicable and subjected Plaintiff to cruel and unjust hardship in knowing disregard of

her rights.

## VII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

63.         Plaintiff Amy Van incorporates by reference the above paragraphs of this

complaint.

64.     The common law of California prohibits an employer from retaliating against an

employee for taking actions to vindicate California public policy, which is clearly articulated by

state and federal statutes and regulations.   This public policy encourages employees to disclose

to a company manager with authority to address violations and to receive reports from

whistleblowers about evidence and information indicating the employer is acting contrary to said

public policies, and state and federal statutes.

65.     The Office of the CEO had authority to take action to uphold these polices and laws and

had been designated as an appropriate recipient of evidence and information regarding violations

thereof.

66.     Plaintiff's disclosures to internal and external officials concerned a persistent pattern of

violation of account eligibility and identity authentication requirements imposed by state and

federal banking and financial services and securities laws.

67.     Plaintiff's disclosed that Defendants had failed to design, implement, staff, provide

training for, maintain, or audit effective and protected internal, external or public reporting

channels for receiving from whistleblower and witnesses cogent and complete information and

To:

Case 5:23-cv-00912-FWS-SP   Document 1-1   Filed 05/19/23   Page 22 of 27   Page ID
Page: 23 of 32              2022-10-28 06:25:35 GMT                18888664720
#:30                                                              From: Stephani Ayers

evidence about corruption, fraud, statutory and regulatory noncompliance and violations, or other wrongdoing by employees, contractors and/or customers.

68.     Plaintiff revealed violations of state law including solicitation of fraud, bribery or forgery under Cal. Penal Code § 653f, consumer financial fraud, and evidence of internal control deficiencies needed to detect fraud and coverups of the suspected illegal activities, including but not limited to:

[a] The Gramm-Leach-Bliley Act, 12 U.S.C. 1811;

[b] the Sarbanes-Oxley Act of 2002 (SOX) as amended by the Dodd-Frank Act, 18 U.S.C. § 1514(a);

[c] section 1057 of the Consumer Financial Protection Act (CFPA), 12 U.S.C. § 5567; and

[d] statutes rules and regulations administered by California's Department of Financial Protection and Innovation (DFPI).

69.     Given the close connection between cross-border wire transactions and money laundering, off-shoring of funds obtained through bribery and theft, and terrorism, the 31 C.F.R. § 1020.220(a) customer identity verification criteria distinguish between "U.S. persons" and "non-U.S. persons" opening, maintaining, using or closing an "account". A "U.S. person" is a citizen of the United States. Under 31 C.F.R. § 1010.605(h), a "non-U.S. person means a natural person who is neither a United States citizen nor is accorded the privilege of residing permanently in the United States pursuant to title 8 of the United States Code."

70.     Under 31 C.F.R. § 1020.220(a), a bank must also distinguish between the types of identification required within the "U.S. persons" classification depending upon citizenship or permanent residency, both of which must be verified, as with a non-U.S. person, upon the following forms of identification: (a) a taxpayer identification number; (b) passport number and country of issuance; (c) alien identification card number; or (d) number and country of issuance

19

To:                    Page: 24 of 32          2022-10-28 06:25:33 GMT          18888664720          From: Stephani Ayers

1   of any other government-issued document evidencing nationality or residence and bearing a

2   photograph or similar safeguard. An "account" under 31 C.F.R. § § 1010.605(c) means "any

3   formal banking or business relationship established by a bank to provide regular services,

4   dealings, and other financial transactions"; and "includes a demand deposit, savings deposit, or

5   other transaction or asset account."

6

7   71.     Under 31 C.F.R. § 1020.220(a), the CIP must implement procedures for validating non-

8   photo documents and for verifying non-documentary methods of identification. These methods

9   include (a) contacting a customer; (b) independently verifying the customer's identity through the

10  comparison of information provided by the customer with information obtained from a public

11

12  database, or other source; and (c) obtaining a financial statement. An example is, as described

13  above, Van's request that the CJ Trade client login to an online account to allow her to compare

14  the online and paper records he presented.

15  72.     In allowing the customers named in Van's disclosures to purchase the referenced products

16  and services for which they did not qualify under federal banking laws, including the Consumer

17

18  Financial Protection Act (CFPA), J.P. Morgan misrepresented its financial consumer product and

19  service eligibility to said customers.

20  73.     12 U.S.C. § 5481(15)(iv) and (vii) define a "financial product or service" within its

21  jurisdiction as including "engaging in deposit-taking activities, transmitting or exchanging funds,

22

23  or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of

24  a consumer;" and "providing payments or other financial data processing products or services to

25  a consumer by any technological means, including processing or storing financial or banking

26  data for any payment instrument, or through any payments systems or network used for

27

28

processing payments data, including payments made through an online banking system or mobile

telecommunications network."

74.     Despite the pattern of CIP violations, J.P. Morgan regularly ignores its obligation to file

Suspicious Activity Reports (SAR). As of April 1, 2013, financial institutions must use the Bank

Secrecy Act (BSA) E-Filing System in order to submit Suspicious Activity Reports. J.P. Morgan

was required to file a SAR on several of Van's disclosures of CIP violations, but they failed to do

so. These SARs were required to have been filed not later than 30 calendar days after the date of

initial detection of facts that may constitute a basis for filing the report. In no case shall reporting

be delayed more than 60 calendar days after the date of initial detection of a reportable

transaction, as a matter of law.

75.     In its Securities and Exchange Commission (SEC) filings, J.P. Morgan represents that it

has disclosed all significant deficiencies in the design or operation of internal controls which

could adversely affect the registrant's ability to record, process, summarize, and report financial

data and that it has identified for the registrant's auditors any material weaknesses in internal

controls. Van's disclosures and criticism to corporate managers, as set forth in this complaint,

indicate that all such disclosures have not fully and truthfully been made to auditors and

shareholders.

76.     Taken in total, all of the above complaints and disclosures by Plaintiff Amy Van about

internal control failures and security risks are evidence of collusion, misrepresentation, and fraud

by J.P. Morgan, and concern material information to shareholders. They are also evidence of

false or reckless certifications by J.P. Morgan under Sections 302 and 404 of the Sarbanes Oxley

Act that it had effective and reliable internal controls in place.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF
## CALIFORNIA LABOR CODE § 1102.5

77.     Plaintiff Amy Van incorporates by reference the above paragraphs of this complaint.

78.     California Labor Code § 1102.5(a)-(b) prohibits an employer from retaliating against an employee for disclosing, to a person with authority over the employee, information which the employee believes discloses a violation of state or federal law.

79.     Retaliation against Plaintiff because of her above-referenced protected activity was a contributing factor in J.P. Morgan's adverse actions against her, and such retaliation was in violation of Labor Code § 1102.5(a)-(b) and the public policy of California.

80.     Defendants were Plaintiff's employer.

81.     Plaintiff disclosed to a person with authority over her, or an employee with authority to investigate, discover, and correct legal violations or noncompliance, that J.P. Morgan was violating a federal or state statute, rule, or regulation as described in this complaint.

82.     Defendants terminated Plaintiff's employment because she made the disclosures of wrongdoing set forth above.

### VIII.  PRAYER FOR RELIEF

Based on the foregoing, Plaintiff requests the following relief:

A.  An Order finding that J.P. Morgan violated the common law of California and Labor Code § 1102.5, and directing, where appropriate, its Directors, Officers, and employees, to cease any ongoing violations and desist from perpetrating any new violations against Plaintiff, including negative references for future employment.

22

B. An Order of reinstatement of Plaintiff to her former position, with front pay and back pay plus interest, and restoration of all terms, conditions, and privileges associated with her employment, including but not limited to:

(i) merit pay increases she should have earned;

(ii) return of all sick and vacation leave used to address or offset the hostility Plaintiff experienced;

(iii) reimbursement of Amy Van's pension and any benefits she would have received had she not been terminated; and

(iv) expungement of all negative references in her employment records, including amendment of the FINRA U5 form to restore her professional viability in the banking and securities industry.

C. Economic damages for lost income and income opportunities in an amount to be determined at trial, including for future lost income.

D. Emotional distress damages in an amount of not less than $1 million, including but not limited to for mental and emotional distress, anxiety, loss of self-esteem and the enjoyment of life, and the costs of therapy and counseling incurred in remediating that emotional distress, and for the destruction and damage to Van's career in financial services.

E. Punitive damages in an amount not less than $10 million, or an amount commensurate with Defendants' assets and the degree of its culpability for the intentional harm to Plaintiff.

F. All costs of litigation and expenses, including attorneys' fees and expert witness fees under California and Labor Code § 1102.5.

G. Any and all other relief available at law and equity, or otherwise available under any statute and regulations, as may be deemed appropriate by this Court.

23

To:    .    Page: 28 of 32              2022-10-28 06:25:35 GMT    18888664720              From: Stephani Ayers

Dated:  October 27, 2022

Respectfully Submitted,

s/Anthony P. X. Bothwell

_____
Anthony P. X. Bothwell, Esq.
558 Presidio Blvd., Ste. B
Post Office Box 29547
San Francisco, CA  94129-0547
Tel.: (415) 370-9571
Email: apxb007@msn.com

Attorney for Plaintiff

Thad M. Guyer, Esq.
Stephani L. Ayers, Esq.
T M Guyer and Ayers & Friends, PC
P.O Box 1061
Medford, OR  97501
Tel: (206) 535-2395
Fax: (888) 866-4720
Email: thad@guyerayers.com
Email: stephani@whistleblowerdefenders.com

Attorneys for Plaintiff
(Pro hac vice motions to be filed)

24